LINCOLN FEDERAL LABOR UNION No. 19129 ET AL., APPELLANTS, V. NORTHWESTERN IRON AND METAL COMPANY, A CORPORATION, ET AL., APPELLEES.

31 N. W. 2d 477

Filed March 19, 1948.     No. 32342.

*Bernard S. Gradwohl* and *Herbert S. Thatcher,* for appellants.

*Walter R. Johnson,* Attorney General, *Clarence S. Beck, Robert A. Nelson, Edward R. Burke, Ralph W. Slocum, Swarr, May, Royce, Smith & Story,* and *Louis B. Finkelstein,* for appellees.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and LANDIS, District Judge.

CHAPPELL, J.

By virtue of and in conformity with the self-executing provisions of section 2, article III, Constitution of Nebraska, the people of this state lawfully initiated, and on November 5, 1946, by a substantial majority adopted a constitutional amendment, which was proclaimed by the Governor as effective December 11, 1946. The

amendment is now designated as sections 13, 14, and 15 of article XV, Constitution of Nebraska. See R. S. Supp., 1947. Hereinafter in this opinion it will be called the amendment.

This action was originally instituted by plaintiffs in the district court for Lancaster County to obtain a declaratory judgment with respect to the interpretation and constitutional validity of the amendment and to obtain equitable relief by specific performance and injunction. Defendant State of Nebraska filed a general demurrer to plaintiffs' petition, and all other defendants filed motions for judgment on the pleadings, thus making the issues entirely of law under such facts as were well pleaded in plaintiffs' petition.

The constitutional issues arose by virtue of plaintiffs' allegations that defendant Northwestern Iron and Metal Company, engaged in intrastate and interstate commerce, had breached its contract with plaintiff, Lincoln Federal Labor Union No. 19129, by the terms of which defendant company had agreed to discharge any employee who ceased to remain a member of the union in good standing. When defendant Dan Giebelhouse was suspended from plaintiff union for non-payment of dues, the company, upon notice thereof and demand by the union for his discharge, refused to do so, taking the position that the union shop provisions of the contract were invalidated and made unenforceable by virtue of the adoption of the amendment. Plaintiff Henry Reichel, an employee of defendant company and president of plaintiff Lincoln Federal Labor Union No. 19129, an affiliate of plaintiffs American Federation of Labor and Nebraska State Federation of Labor, took the position that the union shop provisions of the contract were not invalidated by the adoption of the amendment, because it was unconstitutional for the reasons hereinafter set forth.

As held by this court in Johnson v. Marsh, 146 Neb. 257, 19 N. W. 2d 366: "A general demurrer admits all

allegations of fact in the pleading to which it is addressed, which are issuable, relevant, material, and well pleaded; but does not admit the conclusions of the pleader, except when supported by, and necessarily result from, the facts pleaded. It does not admit inferences of the pleader from the facts alleged, nor mere expressions of opinion, nor theories of the pleader, nor allegations of the pleader as to what will happen in the future, nor arguments, nor allegations contrary to the facts of which judicial notice is taken or which are contrary to law." See, also, 41 Am. Jur., Pleadings, § 244, p. 463, and Louisville & Nashville R. R. Co. v. Palmes, 109 U. S. 244, 3 S. Ct. 193, 27 L. Ed. 922.

Since a motion for judgment on the pleadings is in the nature of a demurrer and is in substance both a motion and a demurrer, it has application in like manner as a demurrer under circumstances similar to those presented in the case at bar. See, Vaughan v. Omaha Wimsett System Co., 143 Neb. 470, 9 N. W. 2d 792; State ex rel. Western Reference & Bond Assn. v. Kinney, 138 Neb. 574, 293 N. W. 393, reversed on other grounds as Olsen v. Nebraska, 313 U. S. 236, 61 S. Ct. 862, 85 L. Ed. 1305, 133 A. L. R. 1500.

In the light of the foregoing rules, the trial court sustained the demurrer and motion for judgment on the pleadings. Plaintiffs having elected to stand upon their petition, a judgment was entered in favor of defendants, declaring the amendment not in conflict with any federal law and constitutional as within the police power of the state, thereby making unlawful and unenforceable in Nebraska the provisions of the agreement between the parties whereby defendant agreed to discharge any employee who ceased to remain a member of the union in good standing, regardless of whether such agreement was executed before or after the effective date of the amendment.

Plaintiffs' motions for new trial were overruled, and they appealed to this court. In their brief they set

forth at length some ·12 assignments of alleged error. They may be summarized, however, as contending that the judgment of the trial court was contrary to law. . Plaintiffs argued primarily that the amendment: (1) Impairs and previously restrains the exercise of the civil rights of assembly and speech guaranteed under the First Amendment, and as protected against state invasion by the Fourteenth Amendment; (2) constitutes class legislation and is highly discriminatory, denying unions and union members the equal protection of the laws, contrary to the Fourteenth Amendment; and (3) arbitrarily and unreasonably impairs the obligations of existing contracts in violation of article I, section 10, and arbitrarily and unreasonably deprives plaintiffs of rights, liberties, and freedoms protected under the 'due process clause of the Fourteenth Amendment. We conclude that those contentions cannot be sustained.

The amendment specifically provides: "Sec. 13. No person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization or because of refusal to join ·or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or nonmembership in a labor organization. Sec. 14. The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, which exists for the purpose, in whole or in part, of dealing with employers concerning . grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. Sec. 15. This article is self-executing and shall supersede all provisions in conflict therewith; legislation may be enacted to facilitate its operation but no law shall limit or restrict the provisions hereof."

At the outset it should be stated that we are not permitted to base our decision of the issues upon a

judicial interpretation of the wisdom of its adoption. Lennox v. Housing Authority of City of Omaha, 137 Neb. 582, 290 N. W. 451. We are confronted primarily with a question of sovereign power. As stated in the opinion of Chief Justice Taney in the License Cases, 5 How. 504, 582: "Upon this question the object and motive of the State are of no importance, and cannot influence the decision. It is a question of power." See, also, Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807, 86 L. Ed. 1143.

In Arizona Employers' Liability Cases, 250 U. S. 400, 419, 39 S. Ct. 553, 63 L. Ed. 1058, 6 A. L. R. 1537, it was said: "The States are left with a wide range of legislative discretion, notwithstanding the provisions of the Fourteenth Amendment; and their conclusions respecting the wisdom of their legislative acts are not reviewable by the courts."

In Hennington v. Georgia, 163 U. S. 299, 16 S. Ct. 1086, 41 L. Ed. 166, it was said: "The whole theory of our government, Federal and state, is hostile to the idea that questions of legislative authority may depend * * * upon opinions of judges as to the wisdom or want of wisdom in the enactment of laws under powers clearly conferred upon the legislature."

As recently as Olsen v. Nebraska, *supra,* the Supreme Court of the United States said: "We are not concerned, however, with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which 'should be left where * * * it was left by the Constitution - to the States and to Congress.' "

In S. Buchsbaum & Co. v. Beman, 14 F. Supp. 444, it was said: "Every possible presumption is in favor of the validity of the statute, and this continues until the contrary is shown beyond a rational doubt. In no doubtful case should a legislative act be pronounced contrary to the Constitution. One branch of the government cannot encroach upon the domain of another with-

out danger. The safety of our institutions depends upon a strict observance of this salutary rule." See, also, Sinking-Fund Cases, 99 U. S. 700, 25 L. Ed. 496; Nicol v. Ames, 173 U. S. 509, 19 S. Ct. 522, 43 L. Ed. 786; Fairbank v. United States, 181 U. S. 283, 21 S. Ct. 648, 45 L. Ed. 862; Lennox v. Housing Authority of City of Omaha, *supra;* 16 C. J. S., Constitutional Law, § 99, p. 250.

In National Labor Relations Board v. Jones & Laughlin, 301 U. S. 1, 30, 57 S. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352, it was said: "The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same." See, also, S. Buchsbaum & Co. v. Beman, *supra;* Panama R. R. Co. v. Johnson, 264 U. S. 375, 44 S. Ct. 391, 68 L. Ed. 748; Blodgett v. Holden, 275 U. S. 142, 48 S. Ct. 105, 72 L. Ed. 206; Lucas v. Alexander, 279 U. S. 573, 49 S. Ct. 426, 73 L. Ed. 851, 61 A. L. R. 906.

As a matter of course, the above rules have application in determining the validity of a constitutional amendment adopted by virtue of the initiative, the first power constitutionally reserved by the people of this state.

All of which brings us to an interpretation of the amendment. It will be observed that section 14 thereof defines the term "labor organization" in the equivalent language used not only in the National Labor Relations Act, Title 29, U. S. C. A., § 152 (5), but also in the Labor Management Relations Act, 1947, c. 120, Public Law 101, § 2 (5). Therefore, nothing provided therein could effect the constitutionality of the amendment. No contention is made otherwise.

The constitutional questions are involved primarily because of sections 13 and 15. As we construe section 13, the first part thereof, down to the ";" simply provides that the hiring and firing of no individual shall

be dependent upon his membership or non-membership in a labor organization. He is thereby made free to "associate with his fellows" in a union entirely upon its merits, or to "decline to associate with his fellows" without imperiling his right either to obtain employment or to continue therein after having obtained it. In other words, the lawful right of the individual to enter employment and his lawful right to continue in his employment cannot be lawfully made to depend either upon the one condition or the other, and he is given a cause of action for violation of that right.

The second part of section 13, after the ";" is simply a correlation of the first and imposes the quality of illegality upon the provisions of any contract which would violate the first by excluding any person from employment because of membership or non-membership in a labor organization, and makes such provisions of any contract invalid and unenforceable as between the parties, without in any logical sense impairing or abridging the right of employees to self-organization and collective bargaining, established by Title 29, U. S. C. A., § 157, hereinafter discussed.

It will be noted that section 15 makes the amendment self-executing, and it thereby became operative upon all such contracts as of its effective date. Therefore, if constitutionally valid as an exercise of the police power of the state, the amendment has application to prevent the enforcement of such provisions in all contracts, whether executed prior to or after the effective date of the amendment. As we view the matter, however, and as the parties involved herein, as well as the trial court, must also have viewed it, the amendment was not intended to and could not so operate as to invalidate and make unenforceable all the other valid provisions of the collective bargaining agreement then existing between the parties. In other words, valid collective bargaining agreements, either existent on the effective date of the amendment or entered into there-

after, would be enforceable in all respects except the provisions in such agreements which would be in conflict with the amendment.

It was argued in the district court that the amendment was invalid because in conflict with the National Labor Relations Act. However, since that argument was made, Congress has passed the Labor Management Relations Act of 1947, which, after specifically amending the National Labor Relations Act, provided, among other things: "Sec. 14. (b) Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

While such provision would seem to conclusively dispose of plaintiffs' argument, the constitutionality thereof has not yet been determined, and, since plaintiffs still contend that the amendment conflicts with paramount federal law, we feel impelled to discuss and decide plaintiffs' contention.

The constitutionality of the National Labor Relations Act has been conclusively affirmed, and in a manner clearly indicating that the validity of the above provision of the Labor Management Relations Act will also be constitutionally affirmed. See National Labor Relations Board v. Jones & Laughlin, *supra*. In any event, we conclude that the amendment was not in conflict with the National Labor Relations Act, and, having been adopted prior to enactment of the Labor Management Relations Act, the amendment is integrated therewith.

It was said in Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U. S. 767, 67 S. Ct. 1026, 91 L. Ed. 887: "In the National Labor Relations Act, Congress has sought to reach some aspects of the employer-employee relation out of which such interferences arise. It has dealt with the subject or relationship but partially, and has left outside of the scope of its delega-

tion other closely related matters. Where it leaves the employer-employee relation free of regulation in some aspects, it implies that in such matters federal policy is indifferent, and since it is indifferent to what the individual of his own volition may do we can only assume it to be equally indifferent to what he may do under the compulsion of the state."

Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U. S. 740, 62 S. Ct. 820, 86 L. Ed. 1154, is authority for the proposition that the intent of Congress to exclude the states from exercising their police power in the field of commerce must be clearly manifest. In discussing the National Labor Relations Act and its relationship to that premise, the court said: "* * * an 'intention of Congress to exclude States from exerting their police power must be clearly manifested.' * * * We will not lightly infer that Congress by the mere passage of a federal Act has impaired the traditional sovereignty of the several States in that regard. * * * Nor can we say that the control which Congress has asserted over the subject matter of labor disputes is so pervasive (Cf. Cloverleaf Butter Co. v. Patterson, *ante*, p. 148) as to prevent Wisconsin, under the familiar rule of Pennsylvania R. Co. v. Public Service Comm'n, 250 U. S. 566, 569, from supplementing federal regulation in the manner of this order. Sec. 7 of the federal Act guarantees labor its 'fundamental right' (Labor Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 33) to self-organization and collective bargaining. Sec. 8 affords employees protection against unfair labor practices of employers including employer interference with the rights secured by sec. 7. * * * If the order of the state Board affected the status of the employees, or if it caused a forfeiture of collective bargaining rights, a distinctly different question would arise. But since no such right is affected, we conclude that this case is not basically different from the common situation where a State takes steps to prevent breaches of the peace in

connection with labor disputes. Since the state system of regulation, as construed and applied here, can be reconciled with the federal Act and since the two as focused in this case can consistently stand together, the order of the state Board must be sustained under the rule which has long obtained in this Court. See Sinnot v. Davenport, 22 How. 227, 243."

In Phelps Dodge Corporation v. National Labor Relations Board, 313 U. S. 177, 61 S. Ct. 845, 85 L. Ed. 1271, 133 A. L. R. 1217, it was said: "And so the present Act, codifying this long history, leaves the adjustment of industrial relations to the free play of economic forces but seeks to assure that the play of those forces be truly free. * * * The prohibition against 'discrimination in regard to hire' must be applied as a means towards the accomplishment of the main object of the legislation. * * *

"The natural construction which the text, the legislative setting and the function of the statute command, does not impose an obligation on the employer to favor union members in hiring employees. He is as free to hire as he is to discharge employees. The statute does not touch 'the normal exercise of the right of the employer to select its employees or to discharge them.' It is directed solely against the abuse of that right by interfering with the countervailing right of self-organization.

"We have already recognized the power of Congress to deny an employer the freedom to discriminate in discharging. Labor Board v. Jones & Laughlin, 301 U. S. 1."

As stated in Associated Press v. National Labor Relations Board, 301 U. S. 103, 132, 57 S. Ct. 650, 81 L. Ed. 953: "The act does not compel the petitioner to employ any one; * * *."

In National Labor Relations Board v. Jones & Laughlin, *supra,* it was said: "The Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may

not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."

As stated in National Labor Relations Board v. National Casket Co., 107 F. 2d 992: "The purpose of the Act is not to compel an employer to hire members of one union rather than another, or union men rather than non-union men."

In International B. of P. M. v. Wisconsin E. R. Board, 249 Wis. 362, 24 N. W. 2d 672, the principal contention of the union was that section 8 (3) of the National Labor Relations Act conferred upon unions and employers the right to enter into an agreement for a closed shop, and that the Wisconsin Employment Peace Act, limiting that right, was in conflict with it.

In that opinion it was said: "Counsel have repeatedly argued to this Court that sec. 8 (3), National Labor Relations Act, already quoted, confers a right. Departing from the precise language of sub. (3), the proviso is as follows: Nothing in this act shall preclude an employer from making an agreement with a labor organization which requires as a condition of employment membership in a union. Just how this clause grants a right, it is difficult to see."

At another point in the opinion it was said: "It is well settled that reports of committees of the house of representatives and of the senate may be consulted to ascertain the intent of Congress as to the meaning of a statute enacted by it. Wright v. Vinton Branch, etc. (1937) 300 U. S. 440, 57 Sup. Ct. 556, 81 L. Ed. 736, 112 A. L. R. 1455, and cases cited in Note 8, p. 1463.

"Referring now to Senate Reports 74th Congress, 1st session (1935) Report No. 573, we find the following (p. 11):

" 'PROBLEM OF THE CLOSED SHOP.

" '* * * Propaganda has been widespread that this proviso attaches special legal sanctions to the closed shop or seeks to impose it upon all industry. This propaganda is absolutely false. * * * The committee feels that this was not the intent of Congress * * *; that it is not the intent of Congress today; and that it is not desirable to interfere in this drastic way with the laws of the several states on this subject.

" 'But to prevent similar misconceptions of this bill, the proviso in question states that nothing in this bill, or in any other law of the United States, or in any code or agreement approved or prescribed thereunder, shall be held to prevent the making of closed-shop agreements between employers and employees. In other words, the bill does nothing to facilitate closed-shop agreements or to make them legal in any state where they may be illegal; it does not interfere with the status quo on this debatable subject but leaves the way open to such agreements as might now legally be consummated, with two exceptions about to be noted.

" 'The assertion that the bill favors the closed shop is particularly misleading in view of the fact that the proviso in two respects actually narrows the now existent law regarding closed-shop agreements. * * *

" 'Secondly, the bill is extremely careful to forestall the making of closed-shop agreements with organizations that have been "established, maintained, or assisted" by any action defined in the bill as an unfair labor practice. * * *.' "

The opinion then went on to say: "This report sustains the construction of the proviso that we have adopted (International B. of E. W. v. Wisconsin E. R. Board, 245 Wis. 532, 15 N. W. (2d) 823), that is, that it granted no right but if there were any impediments to such an agreement in the laws of the United States, they were removed by the provisions of sec. 8 (3), * * *.

"From the report of the committee it appears that

Congress intended to leave state laws regarding the closed shop in force."

Section 14 (b) of the Labor Management Relations Act, which cannot be construed as an invalid delegation of legislative authority, re-established that intent beyond per adventure of a doubt.

The federal public policy in regard to compulsory membership in labor unions was stated in Title 29, U. S. C. A., § 102, wherein it was said: "* * * he should be free to decline to associate with his fellows, * * *."

Title 29, U. S. C. A., § 157, provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." The amendment involved here cannot be construed as impairing, denying, or abridging the right of employees to join and organize into a union and bargain collectively with an employer in conformity with federal law, as provided in that section. It is a matter of common knowledge that many collective bargaining agreements have been and are now being entered into in this state since the adoption of the amendment, which brooks no interference therewith by the employer, and makes the employee directly free from coercion or discrimination by either the employer or the union or members thereof. It does not prohibit such contracts or the enforcement thereof. It does, however, simply make invalid and unenforceable as between the parties, any provision therein agreeing to exclude persons from employment because of membership or non-membership in a labor organization.

We are unable to find any labor legislation enacted by Congress requiring an employee to belong or not belong to a labor organization in order to receive the benefits thereof, or for any other purpose. As a matter of fact. the Railway Labor Act, Title 45, U. S. C. A., c. 8, the

constitutionality of which was conclusively affirmed in Virginia Ry. Co. v. System Federation, 300 U. S. 515, 57 S.. Ct. 592, 81 L. Ed. 789, and discussed by laudatory language in Labor Board v. Jones & Laughlin, *supra,* specifically provides in § 152 (5): "No carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization; and if any such contract has been enforced prior to the effective date of this chapter, then such carrier shall notify the employees by an appropriate order that such contract has been discarded and is no longer binding on them in any way." The amendment at bar certainly does no more than exemplify and apply that policy to all employers and employees in this state.

Plaintiffs argued that the amendment impairs and restrains the exercise of civil rights of assembly and free speech guaranteed by the First Amendment and protected by the Fourteenth Amendment to the Constitution of the United States. The wording of the act is not ambiguous. We cannot by any construction conclude that it violates the First Amendment by abridging freedom of speech, or the press, or the right of assembly, or the right of petition to the government for redress. As a matter of fact, it preserves to all employees the right to organize and join a union and the right to bargain collectively without fear of reprisal. Instead of preventing or abridging rights of speech, press, assembly, or petition, guaranteed by the First Amendment, the amendment preserves it for all employees, not only to those who join but also to those who do not join a union. Therefore, the amendment does not abridge the privileges or immunities of any citizen of the United States in violation of the Fourteenth Amendment, but affirmatively protects those rights. See American Federation of Labor v. Watson, 60 F. Supp. 1010; State v. Whitaker, — N. C. —, 45 S. E. 2d 860; American Federation of

Labor v. American Sash & Door Co., — Ariz. —, 189 P. 2d 912.

Plaintiffs argued that the amendment constituted class legislation and denied unions and union members equal protection of the laws, contrary to the Fourteenth Amendment. We cannot sustain that contention. The amendment prohibits no one from joining a union, but undertakes to lawfully assert that neither membership nor non-membership in a union shall be a condition precedent to the right to work. It is inclusive of all employers and employees in this state. It does not deny the union member the equal protection of the law, but gives the non-union employee a protection of the law which he had not theretofore enjoyed. See American Federation of Labor v. Watson, *supra.*

The amendment complies strictly with the guiding principle most often stated by courts to the effect that: "* * * this constitutional guaranty requires that all persons shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." 12 Am. Jur., Constitutional Law, § 469, p. 129.

As stated in Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923, and approved in Truax v. Corrigan, 257 U. S. 312, 333, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375: "Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

In Hayes v. Missouri, 120 U. S. 68, 7 S. Ct. 350, 30 L. Ed. 578, the court, in speaking of the equal protection clause of the Fourteenth Amendment, said: "It merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed."

It was said in Truax v. Corrigan, *supra*: "\* \* \* the guaranty was intended to secure equality of protection not only for all but against all similarly situated. Indeed, protection is not protection unless it does so."

In Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, speaking of due process and the equality clause of the Fourteenth Amendment, the court said: "These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."

We come then to plaintiffs' contention that the amendment deprives them of rights and privileges under the due process clause of the Fourteenth Amendment. We conclude that it does not. In that connection, we are required to discuss and decide whether or not the amendment is within the police power of the state and whether or not it is reasonable and has a relationship to the public welfare. As related to legislation, it is generally held that due process is satisfied if there was legislative power to act on the subject matter, if that power was exercised in a reasonable and indiscriminatory manner, and if the act, being definite, has a reasonable relationship to a proper legislative purpose. 16 C. J. S., Constitutional Law, § 569, p. 1156; Rein v. Johnson, 149 Neb. 67, 30 N. W. 2d 548.

It will be noted at the outset that by virtue of the Tenth Amendment, Constitution of the United States: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." That provision cannot be amended or obliterated by judicial decree, but only by the source from which it derived original validity.

Therefore, in construing a federal law, courts look to see if the power has been delegated, but in construing a state law they look to see if it has been prohibited,

realizing that the people of a state, by reason of the sovereign power vested in them, may enact a law or alter and amend their own constitution by the method prescribed in the instrument itself, subject, however, to every limitation or restraint lawfully imposed upon them by virtue of some authority derived from the Constitution of the United States. See 11 Am. Jur., Constitutional Law, § 245, p. 966, et seq.

"Police power is the exercise of the sovereign right of a government to promote order, safety, health, morals, and the general welfare of society, within constitutional limits. * * * As applied to the powers of the states of the American Union, the term is also used to denote those inherent governmental powers which, under the federal system established by the constitution of the United States, are reserved to the several states." 16 C. J. S., Constitutional Law, § 174, p. 537. See, also, 11 Am. Jur., Constitutional Law, § 255, p. 986.

In Reid v. Colorado, 187 U. S. 137, 148, 23 S. Ct. 92, 47 L. Ed. 108, it was said: "It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said - and the principle has been often reaffirmed - that 'in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.' Sinnot v. Davenport, 22 How. 227, 243."

As recently as Placek v. Edstrom, 148 Neb. 79, 26 N. W. 2d 489, which involved the state par-check law, this court, in conformity with federal precedent, held that: "No provision of the Constitution of the United States was ever intended to take from states the right to properly exercise their police powers which generally extend to all the great public needs which are lawfully

recognized as immediately necessary to promote the public welfare."

It was said recently in Abeln v. City of Shakopee, — Minn. —, 28 N. W. 2d 642: "Clearly, the original Constitution did not deprive the states of their police power, which they might exercise for the protection of the public health, welfare, and morals. * * * No restraints were imposed upon the police power by the adoption of the Fourteenth Amendment."

As early as Wenham v. State, 65 Neb. 394, 91 N. W. 421, in which the constitutionality of a statute regulating and limiting the hours of employment for female employees was sustained, this court said: "The police power of the state can not be put forward as an excuse for oppressive and unjust legislation, but it may be lawfully resorted to for the purpose of preserving the public health, safety or morals; and a large discretion is vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests."

Fansteel Metallurgical Corporation v. Lodge 66, 295 Ill. App. 323, 14 N. E. 2d 991, is authority for the proposition that Congress, by its enactment of the National Labor Relations Act, did not deprive or attempt to deprive the states of their police power.

In Thomas v. Collins, 323 U. S. 516, 532, 65 S. Ct. 315, 89 L. Ed. 430, it was said: "That the State has power to regulate labor unions with a view to protecting the public interest is, as the Texas court said, hardly to be doubted. They cannot claim special immunity from regulation." See, also, Railway Mail Assn. v. Corsi, 326 U. S. 88, 65 S. Ct. 1483, 89 L. Ed. 2072, sustaining the New York anti-discrimination statute.

In Carpenters & Joiners Union v. Ritter's Cafe, *supra*, it was said: "It is not for us to assess the wisdom of the policy underlying the law of Texas. Our duty is at an end when we find that the Fourteenth Amendment

does not deny her the power to enact that policy into law."

In that opinion the court also said: "The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. See Mr. Justice Holmes in Aikens v. Wisconsin, 195 U. S. 194, 205, and Mr. Justice Brandeis in Truax v. Corrigan, supra, at 372, Dorchy v. Kansas, 272 U. S. 306, 311, and Senn v. Tile Layers Protective Union, 301 U. S. 468, 481. * * * We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants.' Thornhill v. Alabama, 310 U. S. 88, 103-04."

In Barbier v. Connolly, *supra,* it was said: "But neither the amendment - broad and comprehensive as it is - nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity."

In Southern Pacific Co. v. Arizona, 325 U. S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915, it was said: "Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation. Ever since Willson v. Black-Bird Creek Marsh Co., 2 Pet. 245, and Cooley v. Board of Wardens, 12 How. 299, it has been recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the

state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it."

In Parker v. Brown, 317 U. S. 341, 359, 63 S. Ct. 307, 87 L. Ed. 315, it was said: "The governments of the states are sovereign within their territory save only as they are subject to the prohibitions of the Constitution or as their action in some measure conflicts with powers delegated to the National Government, or with Congressional legislation enacted in the exercise of those powers. This Court has repeatedly held that the grant of power to Congress by the Commerce Clause did not wholly withdraw from the states the authority to regulate the commerce with respect to matters of local concern, on which Congress has not spoken."

At another point in the opinion, the court said: "Because of its local character also there may be wide scope for local regulation without substantially impairing the national interest in the regulation of commerce by a single authority and without materially obstructing the free flow of commerce, which were the principal objects sought to be secured by the Commerce Clause. * * * There may also be, as in the present case, local regulations whose effect upon the national commerce is such as not to conflict but to coincide with a policy which Congress has established with respect to it."

In speaking of police power reserved to the states, it was said in the opinion of Chief Justice Taney in the License Cases, *supra*: "It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States."

The above-quoted statement was approved in Nebbia v. New York, 291 U. S. 502, 525, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, wherein it was also said: "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit

governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process,· as has often been held, demands only that the law shall not be unreasonable, arbitrary or· capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. * * * The reports of our decisions abound with cases in which the citizen, individual or corporate, has vainly invoked the Fourteenth Amendment in resistance to necessary and appropriate exertion of the police power." See, also, 16 C. J. S., Constitutional Law, § 569 (3), p. 1156.

The legislative and judicial history of the exercise of police power, together with a synopsis of its elasticity, adaptability, and appropriate application to the relationship between employers and employees, will be found in the dissenting opinion of Justice Brandeis in Truax v. Corrigan, *supra.* Like history will also be found in State v. Whitaker, *supra,* which held constitutional a statute of North Carolina, sections 2, 3, and 4 of which were similar to the Nebraska amendment in all material respects.

It was said in American Federation of Labor v. Watson, *supra:* "Labor and labor unions are affected with a public interest and are subject to the regulatory power of the states for any reasonable regulation which will not be inconsistent with the Constitution of the United States and statutes enacted within the scope delegated by the Constitution to the Congress."

Without doubt the amendment was within the police power of this state. Therefore, we turn to the question of whether or not it is reasonable and has a relationship to the public welfare. In that connection we conclude that it is reasonable and that it does have such relationship.

In Gundling v. Chicago, 177 U. S. 183, 20 S. Ct. 633,

44 L. Ed. 725, it was said: "* * * unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizens are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the State to pass, and they form no subject for Federal interference."

It was said in the opinion of Justice McLean in the License Cases, *supra:* "In all matters of government, and especially of police, a wide discretion is necessary. It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgencies spring up, which require restraints that can only be imposed by the legislative power."

In Muller v. Oregon, 208 U. S. 412, 28 S. Ct. 324, 52 L. Ed. 551, a statute regulating and limiting the hours of labor for female employees was sustained. In the opinion it was said: "Constitutional questions, it is true, are not settled by even a consensus of present public opinion, for it is the peculiar value of a written constitution that it places in unchanging form limitations upon legislative action, and thus gives a permanence and stability to popular government which otherwise would be lacking. At the same time, when a question of fact is debated and debatable, and the extent to which a special constitutional limitation goes is affected by the truth in respect to that fact, a widespread and long continued belief concerning it is worthy of consideration. We take judicial cognizance of all matters of general knowledge."

In West Coast Hotel Co. v. Parrish, 300 U. S. 379, 399, 57 S. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330, it was said: "The legislature had the right to consider that its minimum wage requirements would be an important aid in carrying out its policy of protection. The adop-

tion of similar requirements by many States evidences a deepseated conviction both as to the presence of the evil and as to the means adapted to check it. Legislative response to that conviction cannot be regarded as arbitrary or capricious, and that is all we have to decide. Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the legislature is entitled to its judgment."

We call attention to an appropriate statement appearing in Home Building & Loan Assn. v. Blaisdell, 290 U. S. 398, 442, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481: "It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably led to an increased use of the organization of society in order to protect the very basis of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the State itself were touched only remotely, it has later been found that the fundamental interests of the State are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends.

"It is no answer to say that this public need was not apprehended a century ago; or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means today, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the condi-

tions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning - 'We must never forget that it is *a Constitution* we are expounding' (McCulloch v. Maryland, 4 Wheat. 316, 407) - 'a constitution intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs.' Id. p. 415. When we are dealing with the words of the Constitution, said this Court in Missouri v. Holland, 252 U. S. 416, 433, 'we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. * * * The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago.'

"Nor is it helpful to attempt to draw a fine distinction between the intended meaning of the words of the Constitution and their intended application. When we consider the contract clause and the decisions which have expounded it in harmony with the essential reserved power of the States to protect the security of their peoples, we find no warrant for the conclusion that the clause has been warped by these decisions from its proper significance or that the founders of our Government would have interpreted the clause differently had they had occasion to assume that responsibility in the conditions of the later day. The vast body of law which has been developed was unknown to the fathers, but it is believed to have preserved the essential content and the spirit of the Constitution. With a growing recognition of public needs and the relation of individual right to public security, the court has sought to prevent the perversion of the clause through its use as an instrument to throttle the capacity of the States to protect their fundamental interests. This development is a growth from the seeds which the fathers planted. It is a development forecast by the prophetic words of Justice

Johnson in Ogden v. Saunders, already quoted. And the germs of the later decisions are found in the early cases of the Charles River Bridge and the West River Bridge, *supra,* which upheld the public right against strong insistence upon the contract clause. The principle of this development is, as we have seen, that the reservation of the reasonable exercise of the protective power of the State is read into all contracts * * *."

In Duplex Printing Press Co. v. Deering, 254 U. S. 443, 488, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, Mr. Justice Brandeis in a dissent, said: "All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest, and to declare the duties which the new situation demands."

The people of this state initiated the amendment by original action, without legislative intervention, by filing petitions with the Secretary of State, which were signed by ten percent or more of the electors of the state, so distributed as to include five percent or more of the electors of each of two-fifths or more of the counties of the state. At the election the amendment was adopted by a vote of 212,443 FOR and 142,702 AGAINST. It is common knowledge that its provisions and purposes, as well as the reasons for its adoption or rejection, were widely publicized and ably presented to the electorate of this state prior to the election. It was adopted after considerate and deliberate action. Thus it was decided that its provisions were reasonable and necessary to safeguard the integrity of government and preserve the economic structure and security of the people for the protection of their welfare. With that decision, courts have no right to interfere.

As conditions arising out of powerful industries required legislative regulation thereof to protect first the public generally, and then labor itself, which legislation courts generally have sustained, so now the people of this and other states have evidently decided that conditions have arisen in powerful industries and powerful labor forces as well, requiring legislative regulation of them both in order to protect the public. The Labor Management Relations Act of 1947 was ostensibly enacted for that purpose. As a basis for its enactment, Congress recognized, as disclosed by its committee reports, that such conditions were nation-wide in scope, and specifically provided for the integration of state laws therewith, characterized by the amendment already adopted in this state.

We take judicial notice of the fact that at this writing no less than 18 states have enacted similar legislation, 6 by constitutional enactment and 12 by statutory provisions.

Florida's constitutional amendment was sustained by an able opinion in American Federation of Labor v. Watson, supra. True, upon appeal therefrom, the Supreme Court of the United States (327 U. S. 582) refused to finally pass upon the constitutionality of the Florida amendment until it had been authoritatively construed by the state court, but nevertheless the opinion established a yardstick for its constitutional measurement which affirmatively parallels and sustains our construction of the amendment in the case at bar.

The Supreme Court of Arizona in American Federation of Labor v. American Sash & Door Co., supra, sustained the constitutionality of that state's constitutional amendment, which is very similar to the one here involved.

Likewise, the Supreme Court of Tennessee, in Mascari v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, — Tenn. —, — S. W. 2d —, sustained the constitutionality of that state's legislative act, sections 1 and 2 of which are almost

identical with this state's constitutional amendment.

In the light of the foregoing, we conclude that the amendment is a reasonable and valid exercise of the police power of the state, and as such has a real and substantial relation to its object, the public welfare.

Bearing in mind the foregoing related propositions of law, we turn to the question whether the amendment impairs the obligations of existing contracts in violation of article I, section 10, Constitution of the United States. We conclude that it does not.

Wenham v. State, *supra*, involved the constitutionality of an act regulating and limiting the hours of employment for female employees. In that opinion this court specifically held that such an act was not class legislation, and that the act was only a fair and reasonable exercise of the police power, in that it did not prohibit the right of contract but merely regulated the same in a reasonable manner as in the case at bar. In that connection, the court said: "The right of contract itself is subject to certain limitations which the state may lawfully impose in the exercise of its police power, and this power has been greatly expanded in its application during the past century, * * * ."

In Patterson v. Bark Eudora, 190 U. S. 169, 23 S. Ct. 821, 47 L. Ed. 1002, it was said: "That there is, generally speaking, a liberty of contract which is protected by the Fourteenth Amendment, may be conceded, yet such liberty does not extend to all contracts. As said in Frisbie v. United States, 157 U. S. 160, 165: 'While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may * * * restrain all engaged in any employment from any contract in the course of that employment which is against public policy.' "

As stated in Muller v. Oregon, *supra:* "It is undoubtedly true, as more than once declared by this court, that the general right to contract in relation to one's business is part of the liberty of the individual, protected by the Fourteenth Amendment to the Federal Constitution; yet it is equally well settled that this liberty is not absolute and extending to all contracts, and that a State may, without conflicting with the provisions of the Fourteenth Amendment, restrict in many respects the individual's power of contract."

In Nebbia v. New York, *supra,* it was said: "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

In speaking of deprivation of freedom of contract, it was said in West Coast Hotel Co. v. Parrish, *supra:* "What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs

freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described:

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 567.

"This power under the Constitution to restrict freedom of contract has had many illustrations. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable." Many such illustrations are cited and discussed by the court in its opinion at page 393.

In Long Island Water Supply Co. v. Brooklyn, 166 U. S. 685, 17 S. Ct. 718, 41 L. Ed. 1165, it was said: " 'But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the preexisting and higher authority of the laws of nature, of nations or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all and need never, therefore, be carried into express stipulation, for this could add nothing to their force.' "

In that regard, Home Bldg. & Loan Assn. v. Blaisdell, *supra*, said: "* * * the State also continues to possess authority to safeguard the vital interests of its people.

It does not matter that such legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' * * * Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worthwhile, - a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court."

In Indiana ex rel. Anderson v. Brand, 303 U. S. 95, 108, 58 S. Ct. 443, 82 L. Ed. 685, 113 A. L. R. 1482, it was said: "Our decisions recognize that every contract is made subject to the implied condition that its fulfillment may be frustrated by a proper exercise of the police power * * *."

In Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420, it was said: "That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court."

In Manigault v. Springs, 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274, it was said: "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers * * * for the general good of the public, though contracts previously entered into by individuals may thereby be affected."

In Atlantic Coast Line R. R. Co. v. City of Goldsboro, 232 U. S. 548, 558, 34 S. Ct. 364, 58 L. Ed. 721, it was said: "* * * it is settled that neither the 'contract' clause nor the 'due process' clause has the effect of

overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise."

In the recent case of East New York Savings Bank v. Hahn, 326 U. S. 230, 66 S. Ct. 69, 90 L. Ed. 34, 160 A. L. R. 1279, it was said: "The formal mode of reasoning by means of which this 'protective power of the State,' * * * is acknowledged is of little moment. It may be treated as an implied condition of every contract and, as such, as much part of the contract as though it were written into it, whereby the State's exercise of its power enforces, and does not impair, a contract. A more candid statement is to recognize as was said in Manigault v. Springs, *supra,* that the power, 'which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the * * * general welfare of the people, and is paramount to any rights under contracts between individuals.' * * * Once we are in this domain of the reserve power of a State we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary.' * * * So far as the constitutional issue is concerned, 'the power of the State when otherwise justified,' * * * is not diminished because a private contract may be affected."

In Hudson County Water Co. v. McCarter, 209 U. S. 349, 28 S. Ct. 529, 52 L. Ed. 828, it was said: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them."

It is evident that parties cannot lawfully deprive the state of its police power simply by making a contract between themselves. Since this power of the state to pass legislation which may affect existing contracts is

implied in every contract drawn, then we must read the contract between plaintiff, Lincoln Federal Labor Union, and defendant, Northwestern Iron and Metal Company, as if it actually provided that it was subject to any legislation which the state might adopt under its police power. With such sovereign power implied in the contract, the amendment in question did not impair the existing provisions in their contract but was actually a part of it, and therefore not in violation of any provision of the Federal Constitution.

For the reasons heretofore stated, we conclude that the amendment is a reasonable, proper, and valid exercise of the police power of the state. As such, it is not in conflict with or repugnant to any federal law, but integrated therewith, and does not violate any provision of the Constitution of the United States, but on the contrary guarantees all those rights to all persons whomsoever within this state, whether employers or employees, union members or non-union members.

Therefore, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.