[Civ. No. 7357. Fourth Dist. Sept. 14, 1964.]

WESLEY LEON GALYON, Plaintiff and Appellant, v. THE MUNICIPAL COURT FOR THE SAN BERNARDINO JUDICIAL DISTRICT OF SAN BERNARDINO COUNTY, Defendant and Respondent; THE PEOPLE, Real Party in Interest.

Joseph V. Mazziotta for Plaintiff and Appellant.

Lowell E. Lathrop, District Attorney, and M. S. Tomlinson, Deputy District Attorney, for Defendant and Respondent.

No appearance for Real Party in Interest.

McCABE, J. pro tem.*—Defendant seeks relief by this appeal from a denial by the superior court of application for a writ of prohibition.

Defendant is the father of identical twin boys who, upon birth, were found to be joined at the end of the breast by a cartilage down through the abdomen. This condition gives rise to a common description that they were Siamese twins. At the time of the alleged offense, defendant was exhibiting his sons at the National Orange Show in the County of San Bernardino. The 9-year-old twins were housed in a furnished mobile trailer which had a large window on the side through which the paying public could see and observe the twins. When viewed by the public the twins were fully clothed at all times. An admission fee was charged for the exhibition. At the time of observation by the public, defendant distributed a pamphlet which contained information as to personal data and pictures of the twins. At the same time defendant verbally gave information as to the birth, lives, personalities and living habits of the twins. Defendant derives his sole income from the exhibiting of his 9-year-old sons to the public.

While so exhibiting and displaying his sons, defendant was arrested and charged with a violation of section 400 of the Penal Code, which reads as follows: "Every person exhibiting the deformities of another, or his own deformities, for hire, is guilty of a misdemeanor; and every person who shall, by any artificial means, give to any person the appearance of

---

*Assigned by Chairman of Judicial Council.

a deformity, and shall exhibit such person for hire, shall be guilty of a misdemeanor."

It is noted this section was enacted in 1873.

After his arrest and upon his arraignment, defendant entered his plea of not guilty. The case was then given a definite trial date. Defendant then filed his petition for an application for a writ of prohibition with the superior court which application was denied. Defendant appeals the denial of his application to this court.

After the criminal complaint was filed in the municipal court and at all proper times and in his application for the writ, defendant has contended and maintained that section 400, *supra,* is unconstitutional and void.

Curiously, although this penal section has been part of our laws for over 90 years, there is no reported case in California wherein it is mentioned.

Defendant contends the cited penal section is unconstitutional by virtue of article I, section 1, of the California Constitution and the 14th Amendment to the Constitution of the United States.

 The police power is an inherent attribute of the sovereign which exists as an essential element of all orderly governments (16 C.J.S. Constitutional Law, § 175). It is the right of a government to promote order, safety, health, morals, and the general welfare of society, within constitutional limits. (*Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.,* 149 Neb. 507 [31 N.W.2d 477], *affirmed,* 335 U.S. 525 [69 S.Ct. 251, 93 L.Ed. 212, 6 A.L.R.2d 473] ; *In re Rameriz,* 193 Cal. 633 [226 P. 914, 34 A.L.R. 51].) The power by its very nature is broad and comprehensive (*In re Jones,* 56 Cal.App.2d 658 [133 P.2d 418]). It is founded upon the duty of the state to protect its citizens and to provide for the safety and good order of society (*McKay Jewelers, Inc.* v. *Bowron,* 19 Cal.2d 595, 600 [122 P.2d 543, 139 A.L.R. 1188]). However, ". . . legislation which transcends these objects, whatever other justification it may claim for its existence, cannot be upheld as a legitimate police regulation." (*Ex parte Dickey,* 144 Cal. 234, 236 [77 P. 924, 103 Am. St. Rep. 82, 1 Ann. Cas. 428, 66 L.R.A. 928].) If a statute purporting to have been enacted to protect the public health, safety, or morals has no real or substantive relation to those objects it passes beyond the scope of the police power. (*Ex parte Whitwell,* 98 Cal. 73, 78 [32 P. 870, 35 Am.St.Rep. 152, 19 L.R.A. 727] ; *In re Smith,* 143 Cal. 368 [77 P. 180] ;

*Ex parte Sing Lee,* 96 Cal. 354 [31 P. 245, 31 Am.St.Rep. 218, 24 L.R.A. 195].) The traditional test for validity is whether the ends sought to be attained are appropriate and the regulations prescribed are reasonable. (16 C.J.S. Constitutional Law, § 198.) As stated in *In re Hall,* 50 Cal.App. 786, 790 [195 P. 975]:

"As applied to a law, 'reasonableness' is manifestly not what extremists upon the one side or the other would deem fit and fair. . . . reasonableness is what 'from the calm sea level' of common sense, applied to the whole situation, is not illegitimate in view of the end attained." (See also *People* v. *Aguilar,* 223 Cal.App.2d 119, 123 [35 Cal.Rptr. 516].)

Obviously section 400 does not seek to regulate for by its terms it is a prohibitory statute whereby no deformity may be exhibited for hire. There is no limitation upon the proscription by age, sex or relationship of the exhibitor to those being exhibited.

The history of the section is shrouded and veiled by the passage of time. No reference is given us nor have we found one as to its source. During the period of some decades before and after the enactment there was a vast number of shows, circuses, carnivals and exhibits to the general public of freaks, deformities and weird, unusual and misshapen human beings. Probably the greatest of all exhibitors who preyed upon and became enriched by these unfortunates was P. T. Barnum. He sought and obtained the services of persons who would draw the members of the general public to the display. The individual was compensated but the greatest financial gain was to the exhibitor. (Durant, Pictorial History of the American Circus [Barnes & Co. ed. 1957].) As timid as the general public may have been and as revolted as they may have been to this type exhibit, human curiosity overcame these emotions and money was paid to see the oddity. Possibly by reason of the code of morals extant 1873, section 400 was enacted. Several other states, *circa* 1873, enacted penal statutes somewhat similar to the California statute. These varied from an absolute prohibition against exhibiting deformities to allowing the exhibiting if it was for medical or scientific purposes. Some statutes distinguished between exhibiting deformities of minors and adults. The conclusion must then be drawn that the people of California through the Legislature desired to stop exploitation of deformities for financial gain.

Thus the question is forthrightly presented: Is it a proper exercise of the police power of the state to prohibit an act

for hire which is not so prohibited for non hire? An analysis reveals that under section 400 the act of exhibiting a deformity is not immoral, or injurious to the health of the people or against the public welfare. The prohibition under this section is to anyone making a financial transaction out of the exhibiting of the deformity. To sustain the statute as a proper exercise of police power the financial transaction must then be found to be immoral, dangerous to general health or against public welfare of the people. If not so found the police power has been improperly exercised.

It needs no dissertation to determine that exhibiting a deformity for hire does not affect the health of the general public or that the public welfare is affected for if it affected either the health or the welfare, the effect would be just as pronounced and poignant if exhibited for non hire.

The growth of knowledge, increased experiences, breadth and depth of education by the prodigious increase of publications, and exposure to visual processes has changed the concept of public morality in innumerable areas from the concepts *circa* 1873. Publications and visual processes today reflect these changes when compared to those available in that earlier era. It entails no extended research to find examples on the public newsstands, public streets and public recreation areas and in store windows which, if compared to the standard of an earlier period, would have been immoral and condemned as such by the public. The very essence and plot of many cartoons, motion pictures, television shows are deformities which are paid for in one manner or another, are daily distributed to, and viewed by the general public. The general public has accepted them and indeed encouraged them as part of their lives.

This progression has long since been recognized by the Supreme Court of the United States for it has, in numerous cases wherein the police power is concerned, stated that a statute valid when enacted may become invalid by change in the conditions to which it is applied.

*Nashville C. & St. L. Ry.* v. *Walters,* 294 U.S. 405 [55 S.Ct. 486, 79 L.Ed. 949] ; *Abie State Bank* v. *Bryan,* 282 U.S. 765 [51 S.Ct. 252, 75 L.Ed. 690] ; *Smith* v. *Illinois Bell Telephone Co.,* 282 U.S. 133 [51 S.Ct. 65, 75 L.Ed. 255].

"A change of conditions may invalidate a statute which was reasonable and valid when enacted." (*Perez* v. *Sharp* (concurring opinion) 32 Cal.2d 711, 737 [198 P. 17].) Also, due weight must be given to new and changed conditions.

(*Skalko* v. *City of Sunnyvale,* 14 Cal.2d 213, 216 [93 P.2d 93] ; *Bernstein* v. *Smutz,* 83 Cal.App.2d 108 [188 P.2d 48] ; *Endara* v. *City of Culver City,* 140 Cal.App.2d 33 [294 P.2d 1003].)

■ The reasonable objective of the statute upon its enactment may have been a valid exercise of the police power but because of the changed conditions during the last 91 years perforce requires us to determine that there is no reasonable objective to be reached by the statute. That there might be regulation of exhibits of abnormalities is not questioned but the prohibition of them is an improper exercise of the police power of the state when superimposed upon public morals and welfare of the present era.

The order appealed from is reversed with direction that the superior court issue the writ of prohibition as prayed for.

Griffin, P. J., and Coughlin, J., concurred.