ROBERT L. HANSON ET AL., APPELLEES, V. UNION PACIFIC RAILROAD COMPANY, A CORPORATION, APPELLEE, RAILWAY EMPLOYES' DEPARTMENT, AMERICAN FEDERATION OF LABOR, ET AL., APPELLANTS.
71 N. W. 2d 526

Filed July 1, 1955. No. 33561.

*Schoene & Kramer, Gross, Welch, Vinardi & Kauffman, Mulholland, Robie & Hickey, Richard R. Lyman,* and *Donald W. Fisher,* for appellants.

*Swarr, May, Royce, Smith & Story,* for appellees Hanson et al.

*W. R. Rouse, F. J. Melia, J. H. Anderson,* and *James A. Wilcox,* for appellee Union Pacific R. R. Co.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

Robert L. Hanson, Horace A Cameron, Harold J. Grau, Leonard W. Koch, and William A. Cornell brought this action in the district court for Douglas County. The defendants are the Union Pacific Railroad Company, a corporation, and the following labor organizations: Railway Employes' Department, American Federation of Labor; International Association of Machinists; International Brotherhood of Boilermakers, Iron Ship Builders & Helpers of America; International Brotherhood of Blacksmiths, Drop Forgers & Helpers; Sheet Metal Workers' International Association; International Brotherhood of Electrical Workers; Brotherhood of Railway Carmen of America; International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers; Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express and Station Employes; Brotherhood of Maintenance of Way Employes; The Order of Railroad Telegraphers; Brotherhood of Railroad Signalmen of America; Railroad Yardmasters of America; Hotel and Restaurant Employes International Alliance and Bartenders International League of America; Brotherhood of Sleeping Car Porters; and The American Railway

Supervisors Association, Incorporated. The basis for the action is the contention that the union shop agreements entered into by the Union Pacific Railroad Company and the foregoing labor organizations are in violation of Article XV, section 13, of the Constitution of Nebraska, and section 48-217, R. R. S. 1943. The purpose of this action is to enjoin these defendants, particularly the Union Pacific Railroad Company, from putting into effect the provisions of these union shop agreements. The trial court found the union shop agreements to be in conflict with Nebraska's Constitution and statutes and therefore enjoined the Union Pacific Railroad Company from giving effect to its union shop agreements with the defendant labor organizations insofar as employment in Nebraska is concerned. The labor organizations filed a motion for new trial and have appealed from the overruling thereof.

Article XV, section 13, of the Constitution of Nebraska, provides: "No person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization or because of refusal to join or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or nonmembership in a labor organization."

Section 48-217, R. R. S. 1943, provides: "To make operative the provisions of Sections 13, 14 and 15 of Article 15 of the Constitution of Nebraska, no person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization or because of refusal to join or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or nonmembership in a labor organization."

The appellee Union Pacific Railroad Company is a corporation organized under and existing by virtue of the laws of the State of Utah with its principal place of business located in Omaha, Nebraska. It is a common carrier by rail subject to Part I of the Interstate Commerce Act and a "carrier" within the meaning of and subject to the Railway Labor Act. We will herein refer to it as the Union Pacific.

The appellant labor organizations, at all times herein material, have been and now are the duly designated and authorized collective bargaining representatives of the different crafts or classes of nonoperating employees employed by the Union Pacific. We shall herein refer to them as the labor organizations.

The individually named appellees are residents of the State of Nebraska and employed by the Union Pacific therein. They belong to the craft or class of employees known as clerical, office, station, and storehouse employees who are represented, for the purposes of collective bargaining, by the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes. They are not members of that or any other labor organization which has entered into a union shop agreement with the Union Pacific. They bring this action for themselves and for all other employees of the Union Pacific who are similarly situated. They will herein be referred to as appellees.

Prior to January 10, 1951, the Railway Labor Act prohibited union shops. See 45 U. S. C. A., § 152, Fourth and Fifth, p. 478. However, effective as of that date, Congress amended the Act as follows:

"Eleventh. Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: Provided, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender, the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

"(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: Provided, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

"(c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in the First Division of paragraph (h) of section 153 of this title, defining the

jurisdictional scope of the First Division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subparagraph (b) of this paragraph shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: Provided, however, That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: Provided, further, That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.

"(d) Any provisions in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended." 45 U. S. C. A., § 152, p. 481.

The purpose of this amendment, as stated in Otten v. Baltimore & O. R. Co., 205 F. 2d 58, is to permit: "* * * a railway and a union to agree to a 'union shop' notwithstanding any 'statute or law', state or federal, that forbids such agreements."

Subsequent thereto, and in accordance with and pursuant to the procedures provided by the Railway Labor Act, the Union Pacific and the labor organizations negotiated and entered into agreements in accordance with

the authority granted by the foregoing amendment. The agreements became effective as of March 31, 1953. These agreements required, subject to certain conditions and limitations not material here, that all employees covered by the basic collective bargaining agreements between the Union Pacific and these labor organizations, who were not already members thereof, must, as a condition of their continued employment, file their application with, pay their initiation fee to, and become members of the labor organization representing their respective class or craft within 60 days after the beginning of such employment or the effective date of such agreement, whichever is later, and thereafter maintain such membership.

Appellees were notified by the Union Pacific that they were required, as a condition of their continued employment, to join the labor organization, party to the union shop agreement, which represented the respective class or craft in which they were employed. The appellees did not comply with this notice but brought this action.

The Tenth Amendment to the Constitution of the United States provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

As stated in House v. Mayes, 219 U. S. 270, 31 S. Ct. 234, 55 L. Ed. 213: "* * * the Government created by the Federal Constitution is one of enumerated powers, and cannot, by any of its agencies, exercise an authority not granted by that instrument, either in express words or by necessary implication; that a power may be implied when necessary to give effect to a power expressly granted; that while the Constitution of the United States and the laws enacted in pursuance thereof, together with any treaties made under the authority of the United States, constitute the Supreme Law of the Land, a State of the Union may exercise all such governmental

authority as is consistent with its own constitution, and not in conflict with the Federal Constitution; that such a power in the State, generally referred to as its police power, is not granted by or derived from the Federal Constitution but exists independently of it, by reason of its never having been surrendered by the State to the General Government; * * *."

As to a power expressly granted it was held in United States v. Darby, 312 U. S. 100, 61 S. Ct. 451, 85 L. Ed. 609, 132 A. L. R. 1430: "From the beginning and for many years the amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end."

When Congress acts in regard to a matter over which it has authority it was held in Mondou v. New York, N. H. & H. R. R. Co., 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. N. S. 44: " '* * * The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, "anything in the constitution or laws of any State, to the contrary notwithstanding." ' (McCulloch v. Maryland, 4 Wheat. 316, 17 U. S. 316, 4 L. Ed. 579.) * * * And now that Congress has acted, the laws of the States, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is." See, also, Oregon-Washington R. R. & Navigation Co. v. State of Washington, 270 U. S. 87, 46 S. Ct. 279, 70 L. Ed. 482; Amalgamated Assn. Employees v. Wisconsin Employment Relations Board, 340 U. S. 383, 71 S. Ct. 359, 95 L. Ed. 364, 22 A. L. R. 2d 874; International Union of United Automobile Workers v. O'Brien, 339 U. S. 454, 70 S. Ct. 781, 94 L. Ed. 978; Garner v. Teamsters, Chauffeurs & Helpers Union, 346 U. S. 485, 74 S. Ct. 161, 98 L. Ed. 228. Thus, if two acts cannot be reconciled or consistently stand together the

law of the state must yield. International Union of United Automobile Workers v. O'Brien, *supra*.

However, in the absence of Congress acting in regard thereto, it was held in Cooley v. Board of Wardens of Port of Philadalphia, 12 How. 299, 13 L. Ed. 996: "* * * the mere grant of such a power to Congress, did not imply a prohibition on the states to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the states, and that the states may legislate in the absence of congressional regulations." See, also, Oregon-Washington R. R. & Navigation Co. v. State of Washington, *supra*. As stated in Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 335 U. S. 525, 69 S. Ct. 251, 93 L. Ed. 212, 6 A. L. R. 2d 473: "* * * states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law."

In regard to interstate commerce the foregoing rule has been stated in Oregon-Washington R. R. & Navigation Co. v. State of Washington, *supra,* as follows: "In the relation of the States to the regulation of interstate commerce by Congress there are two fields. There is one in which the State can not interfere at all, even in the silence of Congress. In the other, (and this is the one in which the legitimate exercise of the State's police power brings it into contact with interstate commerce so as to affect that commerce,) the State may exercise its police power until Congress has by affirmative legislation occupied the field by regulating interstate commerce and so necessarily has excluded state action." And, as stated in United States v. Darby, *supra:* "In the absence of Congressional legislation on the subject state laws which are not regulations of the commerce itself

or its instrumentalities are not forbidden even though they affect interstate commerce."

However, even though it enters the field Congress may not necessarily pre-empt it for, as stated in Garner v. Teamsters, Chauffeurs & Helpers Union, *supra:* "Of course, Congress, in enacting such legislation as we have here, can save alternative or supplemental state remedies by express terms, or by some clear implication, if it sees fit." See, also, Amalgamated Assn. Employees v. Wis-- consin Employment Relations Board, *supra;* Algoma Plywood & Veneer Co. v. Wisconsin Employment Rela- tions Board, 336 U. S. 301, 69 S. Ct. 584, 93 L. Ed 691; Hill v. Florida ex rel. Watson, 325 U. S. 538, 65 S. Ct. 1373, 89 L. Ed. 1782; United States v. Darby, *supra.*

"A state law is superseded by a Federal regulation only to the extent that the two may be inconsistent. An act of Congress may occupy only a limited portion of the field of regulation of a particular subject matter, leaving unimpaired the right of the several states to en- act regulations covering other aspects of the subject or merely to supplement the Federal legislation in respect to local conditions." 11 Am. Jur., Constitutional Law, § 175, p. 872.

All this is fully supported by the second paragraph of Article VI, of the Constitution of the United States, which provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance there- of; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." See, also, Mondou v. New York, N. H. & H. R. R. Co., *supra.*

"The principle is therefore fundamental that state laws must yield to acts of Congress within the sphere of its delegated power. It is very obvious that where Congress has under the Federal Constitution the right of exercising exclusive jurisdiction and puts forth its

power to cover the field, state legislation ceases to have efficacy; for when Congress passes a law in that field of legislation common to both Federal and state governments, the act of Congress supersedes all inconsistent state legislation. Congress in regulating a matter within the concurrent field of legislation speaks for all of the people and all of the states, and it is immaterial that the public policy embodied in the congressional legislation overrules the policies theretofore adopted by any of the states with respect to the subject matter of such legislation." 11 Am. Jur., Constitutional Law, § 175, p. 872.

The extent to which Congress has entered the field on any subject depends upon its intent. As was said in Truax v. Raich, 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D 545, Ann. Cas. 1917B 283: "The purpose of an act must be found in its natural operation and effect * * *." See, also, Napier v. Atlantic Coast Line R. R. Co., 272 U. S. 605, 47 S. Ct. 207, 71 L. Ed. 432.

That Congress intended to pre-empt the field is fully evidenced by the following language of the amendment: "Notwithstanding * * * any * * * statute or law * * * of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted * * * to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class * * *."

If additional proof of such intent is needed it can be found in the report submitted by the House of Representatives' Committee on Interstate and Foreign Commerce in connection with H. R. 7789, the bill which submitted the amendment to the House, and the debates in the Senate on S. 3295, a companion bill, particularly in connection with Senator Holland's proposed amend-

ment thereto. A study of the history of the amendment leaves no doubt of the fact that Congress intended to strike down all state constitutional and statutory restrictions relating to union shop agreements insofar as they applied to carriers in interstate commerce and the labor organizations representing their employees. Did Congress have the power to do so?

Article I, section 8, of the Constitution of the United States, insofar as here material, provides: "The Congress shall have Power * * * To regulate Commerce * * * among the several States, * * *."

It was said in Gibbons v. Ogden, 9 Wheaton 1, 6 L. Ed. 23, in regard to the foregoing, that: "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." And that: "* * * Congress may control the State laws, so far as it may be necessary to control them, for the regulation of commerce." See, also, United States v. Darby, *supra;* Mondou v. New York, N. H. & H. R. R. Co., *supra.*

As stated in Mondou v. New York, N. H. & H. R. R. Co., *supra:* "This power over commerce among the States, so conferred upon Congress, is complete in itself, extends incidentally to every instrument and agent by which such commerce is carried on, may be exerted to its utmost extent over every part of such commerce, and is subject to no limitations save such as are prescribed in the Constitution. But, of course, it does not extend to any matter or thing which does not have a real or substantial relation to some part of such commerce."

"The fundamental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' for 'its protection and advancement' (The Daniel Ball, 10 Wall. 557, 564); to adopt measures 'to promote its growth and insure its safety' (Mobile Coun-

ty v. Kimball, 102 U. S. 691, 696, 697); 'to foster, protect, control and restrain.' Second Employers' Liability Cases, supra, p. 47. See Texas & N. O. R. Co. v. Railway Clerks, supra. That power is plenary and may be exerted to protect interstate commerce 'no matter what the source of the dangers which threaten it.' Second Employers' Liability Cases, p. 51; Schechter Corp. v. United States, supra." National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 57 S. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352. See, also, Texas & New Orleans R. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034.

"It should be emphasized that Congress, not the courts, is primarily charged with determination of the need for regulation of activities affecting interstate commerce." American Communications Assn. v. Douds, 339 U. S. 382, 70 S. Ct. 674, 94 L. Ed. 925.

Under this power Congress has dealt with labor relations in fields other than the railroads. See the National Labor Relations Act and the Labor Management Relations Act. The latter is often referred to as the Taft-Hartley Act.

" '* * * The act of interstate commerce is done by the labor of men and with the help of things; and these men and things are the agents and instruments of the commerce.' " Mondou v. New York, N. H. & H. R. R. Co., *supra*.

"It is a familiar principle that acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the congressional power. Acts having that effect are not rendered immune because they grow out of labor disputes. See Texas & N. O. R. Co. v. Railway Clerks, 281 U. S. 548, 570; Schechter Corp. v. United States, supra, pp. 544, 545; Virginian Railway v. System Federation, No. 40, 300 U. S. 515. It is the effect upon commerce, not the source of the injury, which is the criterion. Second Em-

ployers' Liability Cases, 223 U. S. 1, 51." National Labor Relations Board v. Jones & Laughlin Steel Corp., *supra*.

"The constitutional justification for the National Labor Relations Act was the power of Congress to protect interstate commerce by removing obstructions to the free flow of commerce. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1 (1937). That Act was designed to remove obstructions caused by strikes and other forms of industrial unrest, which Congress found were attributable to the inequality of bargaining power between unorganized employees and their employers. It did so by strengthening employee groups, by restraining certain employer practices, and by encouraging the processes of collective bargaining." American Communications Assn. v. Douds, *supra*. See, also, Wallace Corp. v. National Labor Relations Board, 323 U. S. 248, 65 S. Ct. 238, 89 L. Ed. 216.

As stated in Amalgamated Assn. Employees v. Wisconsin Employment Relations Board, *supra*: "The National Labor Relations Act of 1935 and the Labor Management Relations Act of 1947, passed by Congress pursuant to its powers under the Commerce Clause, are the supreme law of the land under Art. VI of the Constitution."

Under this power Congress has dealt with the railroads in regard to many subjects, most of which have been upheld as coming within its authority. They include the Safety Appliance Acts, the Employers Liability Acts, hours-of-service laws, and others of analogous character. See, Mondou v. New York, N. H. & H. R. R. Co., *supra;* Napier v. Atlantic Coast Line R. R. Co., *supra;* Alabama & Vicksburg Ry. Co. v. Jackson & Eastern Ry. Co., 271 U. S. 244, 46 S. Ct. 535, 70 L. Ed. 928; Missouri Pacific R. R. Co. v. Porter, 273 U. S. 341, 47 S. Ct. 383, 71 L. Ed. 672; Northern Pac. Ry. Co. v. State of Washington, 222 U. S. 370, 32 S. Ct. 160, 56 L. Ed. 237; Chicago, R. I. & Pac. Ry. Co. v. Hardwick Farmers Elevator Co., 226 U. S. 426, 33 S. Ct. 174, 57

L. Ed. 284, 46 L. R. A. N. S. 203; Missouri Pac. R. R. Co. v. Stroud, 267 U. S. 404, 45 S. Ct. 243, 69 L. Ed. 683; New York Central R. R. Co. v. Winfield, 244 U. S. 147, 37 S. Ct. 546, 61 L. Ed. 1045, Ann. Cas. 1917D 1139; Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E 938, Ann. Cas. 1918A 1024.

As stated in Mondou v. New York, N. H. & H. R. R. Co., *supra:* "Among the instruments and agents to which the power extends are the railroads over which transportation from one State to another is conducted, the engines and cars by which such transportation is effected, and all who are in any wise engaged in such transportation, whether as common carriers or as their employés."

Congress enacted the Railway Labor Act to regulate the common carriers of the country and their employees. "* * * Congress, in the exertion of its power over interstate commerce, may regulate the relations of common carriers by railroad and their employes, while both are engaged in such commerce, subject always to the limitations prescribed in the Constitution, and to the qualification that the particulars in which those relations are regulated must have a real or substantial connection with the interstate commerce in which the carriers and their employes are engaged." Mondou v. New York, N. H. & H. R. R. Co., *supra.* See, also, Wilson v. New, *supra.*

The primary purpose of the Railway Labor Act is set forth therein as follows: "First. It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U. S. C. A., § 152, p. 478.

"The plain objective of the Railway Labor Act is the amicable adjustment of disputes and in that way to avoid strikes with their harmful effect upon public interests." Brotherhood of Railroad Shop Crafts v. Lowden, 86 F. 2d 458. See, also, Texas & New Orleans R. R. Co. v. Brotherhood of Railway & Steamship Clerks, *supra;* Railroad Retirement Board v. Alton R. R. Co., 295 U. S. 330, 55 S. Ct. 758, 79 L. Ed. 1468; Steele v. Louisville & N. R. R. Co., 323 U. S. 192, 65 S. Ct. 226, 89 L. Ed. 173.

"The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern." Virginian Ry. Co. v. System Federation No. 40, 300 U. S. 515, 57 S. Ct. 592, 81 L. Ed. 789. See, also, Texas & New Orleans R. R. Co. v. Brotherhood of Railway & Steamship Clerks, *supra.*

"The power of Congress over interstate commerce extends to such regulations of the relations of rail carriers to their employees as are reasonably calculated to prevent the interruption of interstate commerce by strikes and their attendant disorders." Virginian Ry. Co. v. System Federation No. 40, *supra.*

It is to this purpose that the amendment authorizing agreements to be entered into between a carrier or carriers and a labor organization or labor organizations providing for a union shop and agreements authorizing deductions to be made by carriers from the wages of its employees for certain purposes and under certain conditions must reasonably relate itself.

Appellees contend that the sole purpose for enacting the amendment was to get rid of free-riders in the railroad industry and that trying to do so in this manner is not reasonably calculated to prevent the interruption of interstate commerce by strikes and their attendant disorders but rather to create them. They state that the subject of union shops has always been a prolific

source of labor disputes and, in support thereof, point to the record of what took place here and what has taken place on other railroads in that regard. They also point to the fact that union representatives, at the hearings before the committees of Congress, conceded that a union shop would not affect their bargaining power one way or the other and to other factors, such as the financial and numerical strength of the unions, to show they do not need additional governmental help in order for them to properly carry on their function of collective bargaining and deal with the carriers on an equal level. While we think there is much merit in the logic of appellees' contentions we cannot adopt it as here controlling for reasons hereinafter set forth.

The Supreme Court of the United States, in National Labor Relations Board v. Jones & Laughlin Steel Corp., *supra*, said: "Long ago we stated the reason for labor organizations. We said that they were organized out of the necessities of the situation; that a single employee was helpless in dealing with an employer; that he was dependent ordinarily on his daily wage for the maintenance of himself and family; that if the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and resist arbitrary and unfair treatment; that union was essential to give laborers opportunity to deal on an equality with their employer. American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 209. We reiterated these views when we had under consideration the Railway Labor Act of 1926. Fully recognizing the legality of collective action on the part of employees in order to safeguard their proper interests, we said that Congress was not required to ignore this right but could safeguard it. Congress could seek to make appropriate collective action of employees an instrument of peace rather than of strife."

Within its power, policy making in this regard, is still for Congress. Colgate-Palmolive-Peet Co. v. Na-

tional Labor Relations Board, 338 U. S. 355, 70 S. Ct. 166, 94 L. Ed. 161.

In that regard it has been said: "Even should we consider the Act unwise and prejudicial to both public and private interest, if it be fairly within delegated power our obligation is to sustain it." Railroad Retirement Board v. Alton R. R. Co., *supra.*

There is no question but what Congress had the right to repeal the restrictive provisions against union shops which it placed in the Railway Labor Act in 1934. This it did by the amendment of January 10, 1951. If that had been the only thing done then, without federal legislation on the subject, the laws of the several states would be controlling. See, Otten v. Baltimore & O. R. Co., *supra;* Wicks v. Southern Pac. Co., 121 F. Supp. 454, and authorities hereinbefore cited. There are 17 states that have some form of restriction against union shops and 31 that do not. Since union shop agreements are legal and enforceable, unless restricted by either the state or federal government, this left an anomalous situation. That Congress was fully aware of this situation is evidenced by the following quote from the report of the Committee on Interstate and Foreign Commerce of the House of Representatives in submitting the amendment to the House: "It will be noted that the proposed paragraph eleventh would authorize agreements notwithstanding the laws of any State. For the following reasons, among others, it is the view of the committee that if, as a matter of national policy, such agreements are to be permitted in the railroad and airline industries it would be wholly impracticable and unworkable for the various States to regulate such agreements. Railroads and airlines are direct instrumentalities of interstate commerce; the Railway Labor Act requires collective bargaining on a system-wide basis; agreements are uniformly negotiated for an entire railroad system and regulate the rates of pay, rules of working conditions of employees in many States;

the duties of many employees require the constant crossing of State lines; many seniority districts under labor agreements, extend across State Lines, and in the exercise of their seniority rights employees are frequently required to move from one State to another."

In this situation we think Congress had before it a situation of which it could properly take notice and upon which it could reasonably act. However, in regard to such action, it was limited by the following principles:

"* * * the powers conferred upon the Federal Government are to be reasonably and fairly construed, with a view to effectuating their purposes. But recognition of this principle can not justify attempted exercise of a power clearly beyond the true purpose of the grant." Railroad Retirement Board v. Alton R. R. Co., *supra*.

"* * * Congress, in the choice of means to effect a permissible regulation of commerce, must conform to due process, * * *." Virginian Railway Co. v. System Federation No. 40, *supra*.

"* * * if the provisions go beyond the boundaries of constitutional power we must so declare." Railroad Retirement Board v. Alton R. R. Co., *supra*.

Courts have enforced union and closed shop agreements. They are ordinarily considered private contracts in which governmental action is not involved. See, Colgate-Palmolive-Peet Co. v. National Labor Relations Board, *supra;* National Licorice Co. v. National Labor Relations Board, 309 U. S. 350, 60 S. Ct. 569, 84 L. Ed. 799; Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, *supra*.

Apparently the federal government has never affirmatively authorized closed shops and, prior to this amendment to the Railway Labor Act, has never taken affirmative action to authorize union shops. Since the due process clause protects against governmental action, either state or federal, union shop contracts have been enforced and, of course, have not been held illegal on

constitutional grounds as that question was not involved.

As stated in Teague v. Brotherhood of Locomotive Firemen, 127 F. 2d 53: "Private parties acting upon their own initiative and expressing their own will, however else they may offend and their acts give rise to justiciable controversies, do not thereby offend the guarantees of the Constitution. Grovey v. Townsend, 295 U. S. 45, 55 S. Ct. 622, 78 L. Ed. 1292, 97 A. L. R. 680." See, also, Corrigan v. Buckley, 271 U. S. 323, 46 S. Ct. 521, 70 L. Ed. 969; Courant v. International Photographers, 176 F. 2d 1000.

The Fifth Amendment to the Constitution of the United States provides, insofar as here material, that: "No person shall * * * be deprived of life, liberty, or property, without due process of law; * * *."

It was held in Railroad Retirement Board v. Alton R. R. Co., *supra*, the power of Congress to regulate interstate commerce is subject thereto. And it was held in Secretary of Agriculture v. Central Roig Refining Co., 338 U. S. 604, 70 S. Ct. 403, 94 L. Ed. 381, not even resort to the commerce clause can defy the standard of due process.

"The Fifth Amendment relates but to governmental action, federal in character, not to action by private persons. Corrigan v. Buckley, 271 U. S. 323, 46 S. Ct. 521, 70 L. Ed. 969; National Federation of Ry. Workers v. National Mediation Board, 71 App. D. C. 266, 110 F. 2d 529, 537." Teague v. Brotherhood of Locomotive Firemen, *supra*.

"When the question is whether legislative action transcends the limits of due process guaranteed by the Fifth Amendment, decision is guided by the principle that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. Nebbia v. New York, 291 U. S. 502, 525." Footnote from Railroad Retirement Board v. Alton R. R. Co., *supra*. See, also, Virginian Ry. Co. v. System Federation No.

40, *supra*; Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 149 Neb. 507, 31 N. W. 2d 477.

But, as stated in Currin v. Wallace, 306 U. S. 1, 59 S. Ct. 379, 83 L. Ed. 441: "There is no requirement of uniformity in connection with the commerce power (Art. I, § 8, par. 3) * * *. Undoubtedly, the exercise of the commerce power is subject to the Fifth Amendment (Monongahela Navigation Co. v. United States, 148 U. S. 312, 336; United States v. Cress, 243 U. S. 316, 326; Louisville Bank v. Radford, 295 U. S. 555, 589); but that Amendment, unlike the Fourteenth, has no equal protection clause. LaBelle Iron Works v. United States, 256 U. S. 377, 392; Steward Machine Co. v. Davis, 301 U. S. 548, 584."

Appellees contend they are deprived of certain contractual and property rights by this amendment. Among these they specifically list their seniority, vacation, free transportation, and rights under the Railway Labor Act, particularly paragraphs Third, Fourth, and Fifth, 45 U. S. C. A., § 152, p. 478. Among the latter they refer to the right to be free from being influenced or coerced by their employers to induce them to join or remain members of any labor organization.

It is true, as stated in Primakow v. Railway Express Agency, 56 F. Supp. 413, that seniority rights are property and the exclusive property of the individual employee.

However, as stated in J. I. Case Co. v. National Labor Relations Board, 321 U. S. 332, 64 S. Ct. 576, 88 L. Ed. 762:

"Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in

what often has been called a trade agreement, rather than in a contract of employment. * * *

"After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. But the terms of the employment already have been traded out. There is little left to individual agreement except the act of hiring. This hiring may be by writing or by word of mouth or may be implied from conduct. In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure.

"But, however engaged, an employee becomes entitled by virtue of the Labor Relations Act (here Railway Labor Act) somewhat as a third party beneficiary to all benefits of the collective trade agreement, even if on his own he would yield to less favorable terms. The individual hiring contract is subsidiary to the terms of the trade agreement and may not waive any of its benefits * * *."

As stated in West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330:

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 567.

"This power under the Constitution to restrict freedom of contract has had many illustrations. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable."

And in Brotherhood of Railroad Shop Crafts v. Lowden, *supra,* it was said: "The fact that the parties here were bound by an existing contract at the time the act became effective is no basis upon which to invoke the due process clause of the Fifth Amendment. The privilege of contract is not unrestricted. The right to make contracts which relate to interstate commerce must be exercised subject to the paramount power of Congress to enact appropriate legislation touching the subject matter. Any other rule would proscribe Congress in the exercise of its constitutional prerogative to regulate commerce among the states."

"* * * the Fifth Amendment, * * *, is not a guarantee of untrammeled freedom of action and of contract. In the exercise of its power to regulate commerce, Congress can subject both to restraints not shown to be unreasonable." Virginian Ry. Co. v. System Federation No. 40, *supra.*

"Wherever private contracts conflict with its functions, they obviously must yield or the Act would be reduced to a futility." J. I. Case Co. v. National Labor Relations Board, *supra.*

"The mere existence of such differences does not make them invalid." Ford Motor Co. v. Huffman, 345 U. S. 330, 73 S. Ct. 681, 97 L. Ed. 1048.

"* * * collective bargaining agreements do not create a permanent status, give an indefinite tenure, or extend rights created and arising under the contract, beyond its life, when it has been terminated in accordance with its provisions." System Federation No. 59 v. Louisiana & A. Ry. Co., 119 F. 2d 509. See, also, Brotherhood of Railroad Shop Crafts v. Lowden, *supra.*

As these principles relate to the foregoing we think what Congress did in this regard was within its powers

and reasonable provided Congress could impose upon these employees the requirement compelling them to join a union as a condition of their continued employment for, by joining, all of the property rights of which appellees claim they will be deprived would be saved to them. We shall hereinafter discuss the question of the power of Congress to impose such a requirement and, if it could be said that it has such power, the reasonableness thereof.

Appellees also claim that the amendment is unreasonable because Congress therein imposed in subsection (c) certain limitations applicable in union shop contracts relating to employees in the operating crafts, having to do with a prohibition against a contractual requirement of membership in more than one union, whereas, it did not make the same limitation applicable in union shop contracts relating to the employees in the nonoperating crafts. They say it authorizes contracts requiring nonoperating employees to join and pay fees, dues, and assessments to each union representing a craft or class in which such employees may have employment and that one employee may have employment in more than one craft or class, whereas, operating employees are required to belong to only one union and must be permitted to choose any union national in scope, admitting to membership operating employees, and are not required to join the particular union which is their collective bargaining representative. They contend this arbitrarily discriminates between operating and nonoperating employees. This limitation was placed in the Act because of the problem of "ebb and flow" of employees between two crafts, which problem is particularly acute in the operating crafts, and relatively insignificant in the nonoperating crafts. Classification of railroad employees into operating and nonoperating groups is traditional on railroads, and certainly is reasonable as a basis of classification for purposes of railroad legislation.

As already stated herein, the Fifth Amendment does not require that everyone be equally affected by an Act of Congress in order for it to be within the due process requirement thereof. The classification here made by Congress, considering the problems involved, seems reasonable under all of the circumstances.

As stated in Pfeiffer Brewing Co. v. Bowles, 146 F. 2d 1006: "Equal protection of the law is the constitutional right of every American citizen. Indeed, it has frequently been said to be essential to due process of law guaranteed by the constitution. Amendment 5. In other words, legislation must be general in character upon the subjects to which it is related and enforceable in the usual modes adapted to the facts in the case. Dent v. West Virginia, 129 U. S. 114, 9 S. Ct. 231, 32 L. Ed. 623. Class legislation discriminating against some and favoring others is prohibitive. But the rule does not prohibit or prevent classification which is reasonable, for, while the law must affect alike all persons in the same class and under similar conditions, classification based upon substantial distinction, with a proper relation to the objects classified and the purposes sought to be achieved, if it does operate alike on all members of the class, is not special, discriminatory or class legislation. Obviously, classifications must embrace all who belong in the same category and may not be capricious or arbitrary. But if the statute is uniform in the obligation of all members of a legitimate class, to which it is made applicable, no one can complain of denial of equal protection of the laws."

" '* * * the attempted classification "must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." Gulf, Colorado & Santa Fe Ry. v. Ellis, 165 U. S. 150, 155.' (Louisville Gas & Electric Co. v. Coleman, 277 U. S. 32, 48 S. Ct. 423, 72 L. Ed. 770.)" Hartford Steam Boiler Inspection & Insur-

ance Co. v. Harrison, 301 U. S. 459, 57 S. Ct. 838, 81 L. Ed. 1223.

Appellees contend the amendment permits discrimination between those the union say must join and those they will excuse from joining. This relates to subsection (a) of the amendment which has hereinbefore been set forth. This subsection simply affords a guarantee to all employees who are refused admission to or expelled from the contracting union for any reason other than failure to tender initiation fees, dues, or assessments that they will not be deprived of their employment because of nonmembership in the union. Such a provision is certainly reasonable and desirable for without it the union could arbitrarily defeat an employee's continued right to work.

It is further contended this delegates to the union the power to decide who shall and who shall not be compelled to join and pay money to such labor organization in the way of initiation fees, dues, and assessments. As already stated herein, the Fifth Amendment does not require that everyone be equally affected by an act of Congress.

"Because of the necessity to have strong unions to bargain on equal terms with strong employers, individual employees are required by law to sacrifice rights which, in some cases, are valuable to them. See J. I. Case Co. v. Labor Board, 321 U. S. 332 (1944)." American Communications Assn. v. Douds, *supra*. See, also, Steele v. Louisville & N. R. R. Co., *supra;* Currin v. Wallace, *supra;* Wilson v. New, *supra*.

Appellees further complain that if they are required to pay initiation fees, dues, and assessments that the amount they will be required to pay will not necessarily be based on the cost of collective bargaining for the funds so collected could be used for any purpose decided upon by the union and thus they would be deprived of their money without due process. We will hereinafter discuss this issue.

In addition to the foregoing contentions specifically dealt with others of like character are referred to by appellees. We think the following principle has application to all of them: "* * * legislative authority, exerted within its proper field, need not embrace all the evils within its reach. The Constitution does not forbid 'cautious advance, step by step,' in dealing with the evils which are exhibited in activities within the range of legislative power." National Labor Relations Board v. Jones & Laughlin Steel Corp., *supra*. See, also, Steele v. Louisville & N. R. R. Co., *supra;* Currin v. Wallace, *supra;* Wilson v. New, *supra;* Secretary of Agriculture v. Central Roig Refining Co., *supra;* West Coast Hotel Co. v. Parrish, *supra*.

And as stated in Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 335 U. S. 525, 69 S. Ct. 251, 93 L. Ed. 212, 6 A. L. R. 2d 473: "Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare."

Appellees contend this amendment to the Railway Labor Act, together with the contracts it authorizes, compels railway employees to become members of an association (labor organization) against their will and thus deprives them of freedoms guaranteed by the First Amendment to the Constitution of the United States. They claim the right of the freedom of association, the freedom to join or not to join, as a First Amendment freedom.

The First Amendment to the Constitution of the United States provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

As stated in West Virginia State Board of Education v. Barnette, 319 U. S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628, 147 A. L. R. 674: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."

We think the freedom of association, the freedom to join or not to join in association with others for whatever purposes such association is lawfully organized, is a freedom guaranteed by the First Amendment.

We also think the right to work is one of the most precious liberties that man possesses. Man has as much right to work as he has to live, to be free, to own property, or to join a church of his own choice for without freedom to work the others would soon disappear. It is a fundamental human right which the due process clause of the Fifth Amendment protects from improper infringement by the federal government. To work for a living in the occupations available in a community is the very essence of personal freedom and opportunity that it was one of the purposes of these amendments to make secure. Liberty means more than freedom from servitude. The constitutional guarantees are our assurance that the citizen will be protected in the right to use his powers of mind and body in any lawful calling. Smith v. State of Texas, 233 U. S. 630, 34 S. Ct. 681, 58 L. Ed. 1129, L. R. A. 1915D 677, Ann. Cas. 1915D 420; Truax v. Raich, *supra.*

These rights should only be susceptible of restriction to prevent grave and immediate danger to interests which the government is obligated to protect. West Virginia State Board of Education v. Barnette, *supra;*

Thomas v. Collins, 323 U. S. 516, 65 S. Ct. 315, 89 L. Ed 430.

As stated in Thomas v. Collins, *supra:* "The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. Schneider v. State, 308 U. S. 147; Cantwell v. Connecticut, 310 U. S. 296; Prince v. Massachusetts, 321 U. S. 158. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice."

We find no condition to have existed at the time the amendment was adopted to authorize any restriction of these rights. Consequently we think Congress was without authority to impose upon employees of railroads in Nebraska, contrary to our Constitution and statutory provisions, the requirement that they must become members of a union representing their craft or class as a condition for their continued employment. It improperly burdens their right to work and infringes upon their freedoms. This is particularly true as to the latter because it is apparent that some of these labor organizations advocate political ideas, support political candidates, and advance national economic concepts which may or may not be of an employee's choice.

However, the labor organizations contend that Congress, by the amendment, merely repealed the restrictive provision put in the Act in 1934; that Congress, by doing so, did not make any change in the terms and conditions of the employment of appellees; that impairment of rights, if any resulted therefrom, were brought about by private union shop agreements permitted as

a result of the amendment; and that such private agreements are enforcible.

On the other hand appellees contend Congress, by the amendment, did not merely repeal the restriction against union shops placed in the 1934 Act, and thus permit private union shop agreements, but, in order to make such union shop agreements effective in the 17 states that had restrictive laws against union shop agreements, which included Nebraska, struck down such laws; that, as a result thereof, every union shop contract entered into thereunder depends for its validity in these 17 states upon the act of Congress; and that, because thereof, every such contract involves governmental action and therefore is subject to the due process clause of the Fifth Amendment.

We agree with appellees. If Congress had merely repealed the restrictive provision of the 1934 Act then the labor organizations' position would be correct. But to do so would have left 17 states with restrictive laws as to union shops. These laws Congress affirmatively sought to strike down. Such action on the part of Congress is a necessary part of every union shop contract entered into on the railroads as far as these 17 states are concerned for without it such contracts could not be enforced therein.

For the sake of discussion let us assume that the right to require employees in interstate commerce to become members of a union falls under the general power of Congress to regulate interstate commerce rather than under the freedoms guaranteed by the First and Fifth Amendments. Whether legislative action under this power transcends the limits of due process guaranteed by the Fifth Amendment depends upon whether it is reasonable and whether or not the means selected have a real and substantial relation to the objects sought to be obtained. See authorities hereinbefore cited. It is apparent that the purpose of the amendment was to get rid of free-riders. A free-rider is an

employee who receives all of the benefits of collective bargaining but in return does not bear any of the costs thereof because he does not belong to the union which negotiated and secured such benefits. Assuming it would be reasonable to require free-riders to pay their proportionate share of the cost of collective bargaining carried on in their behalf by labor organizations, we do not think the means selected has any real and substantial relation to the object sought to be obtained. First, and primarily, because an employee's freedom of association, that is the right to join or not to join a union, has no relationship to the object sought, and second, because by requiring him to pay initiation fees, dues, and assessments he is required to pay for many things besides the cost of collective bargaining. In this regard we are aware of what has been said in Colgate-Palmolive-Peet Co. v. National Labor Relations Board, *supra;* and Radio Officers' Union v. National Labor Relations Board, 347 U. S. 17, 74 S. Ct. 323, 98 L. Ed. 455.

A labor organization, under the Railway Labor Act, represents all of the employees of a class or craft on a carrier whom it is designated and authorized to represent. Steele v. Louisville & N. R. R. Co., *supra;* Wallace Corp. v. National Labor Relations Board, *supra.*

It has the exclusive power to negotiate and enter into agreements with the carrier concerning rates of pay, rules, and working conditions as they affect the employees of the class or craft it represents. A. F. of L. v. American Sash & Door Co., 335 U. S. 538, 69 S. Ct. 258, 93 L. Ed. 222, 6 A. L. R. 2d 481.

And, in dealing with the carrier in regard thereto, it must act fairly, impartially, and in good faith. Steele v. Louisville & N. R. R. Co., *supra;* Ford Motor Co. v. Huffman, *supra;* Lewellyn v. Fleming, 154 F. 2d 211; Wallace Corp. v. National Labor Relations Board, *supra.*

Even though Congress has seen fit to clothe labor organizations on the railroads with the above powers and assuming it would be reasonable for it to require all

employees receiving benefits from collective bargaining agreements to contribute their proportionate share of the cost thereof, a question not before us and one which we do not decide, we are, nevertheless, of the opinion that it cannot be done in the manner in which it was here attempted. To require all employees receiving benefits from collective bargaining agreements to pay the labor organizations obtaining them initiation fees, dues, and assessments is to require them to make contributions to any and all of the varied objects and undertakings in which such labor organizations are or may become engaged and which have no substantial relation to the object here sought to be obtained.

In view of what has been herein said we affirm the judgment of the district court.

AFFIRMED.

CARTER, J., concurring.

I am in full accord with the result reached by the majority. It seems to me, however, that the fundamental constitutional question should be pointed up in a more specific manner.

It must be conceded at the outset that if Congress lacks the power to compel union membership because of constitutional guarantees or prohibitions, the validity of Article XV, section 13, of the Constitution of Nebraska, is not subject to question. See Lincoln Federal Labor Union v. Northwestern Iron and Metal Co., 149 Neb. 507, 31 N. W. 2d 477. As the majority opinion states, the purpose sought to be accomplished was to eliminate free-riders by compelling them to pay their proportionate shares of the cost of representation in the collective bargaining process. For the purposes of this discussion it will be assumed that the object was a lawful one which the Congress could bring about without offending constitutional provisions. The majority opinion correctly holds that there was no reasonable relation between the purpose to be accomplished and the legislative method invoked to bring it about.

I fail to see any relation, whatever, between compelling union membership and enforcing payments by employees for benefits received from collective bargaining. Assuming that contributions can be compelled for the representation required in securing benefits accruing to nonunion employees as well as those belonging to the union, compulsory union membership exceeds the necessities of the case and compels an employee to join and support an association of persons with whose purposes and concepts he may be in total disagreement. The Constitution protects an individual against legislation having this effect.

If an employee is compelled to join a union against his will in order to continue in his employment, he not only pays his share of the cost of the union's bargaining processes, but he is compelled to support many other principles, policies, programs, and activities to which he may not subscribe. Some unions support a form of life insurance which pays death benefits; some support a welfare fund for the benefit of needy members. Some unions maintain a strike fund to protect employees when on strike; some establish funds to be used in the furtherance of economic and political principles in which an employee may have no confidence. In some instances compulsory membership would compel support, financial and otherwise, of policies which an employee might deem objectionable from the standpoint of free government and the liberties of the individual under it. An employee may neither desire the benefits of such programs nor desire to contribute to their support. He may object to certain programs and activities of the union for reasons of his own and, consequently, not desire to contribute to their promulgation. To compel an employee to make involuntary contributions from his compensation for such purpose is a taking of his property without due process of law.

We have prided ourselves in this country on the right of free speech and free thought, rights which have been

guaranteed to us by constitutional provision. Compulsory unionism infringes upon these rights and often encroaches upon the right of an individual to be free from coercion by others. To compel him to contribute to the support of economic or political programs adopted by a union, which may be abhorrent to him, is as constitutionally wrong as if similar programs were compelled by the employer. The Fifth Amendment protects against the forced appropriation of one's property for the support of ideals which he may desire to oppose. The right to work and to be compensated therefor is a fundamental principle in our democratic thinking. To force contributions against one's will in the manner here employed is a violation of his fundamental rights and privileges. It is a violation of "nor be deprived of life, liberty, or property, without due process of law," contained in the Fifth Amendment of the Constitution of the United States.

Constitutional guarantees exist in fair weather and in foul. They may be asserted by the minority against the majority, and by the individual even against the power of government. They may be asserted by an employee against his employer or a labor union, or both. An employee not only has a right to work, but he has the guaranteed right to have his earnings protected against confiscation against his will. Forcing an employee to join a union and to compel him to financially support principles, projects, policies, or programs in which he does not believe and does not want, is clearly a taking of his property without due process.

If this be true, the constitutional provision here questioned is declaratory of the rights guaranteed to plaintiffs under the Constitution of the United States and, consequently, is not subject to the attack made upon it by these defendants.

I am authorized to say that SIMMONS, C. J., is in accord with this concurrence.